Filed 7/28/21  P. v. Vejar CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH LUIS VEJAR,<br><br>    Defendant and Appellant. | H044486<br>(Santa Clara County<br>Super. Ct. No. 213441) |

After a years-long investigation into the Nuestra Familia criminal street gang, defendant Joseph Vejar and 48 other individuals were indicted for criminal offenses committed for the benefit of or in association with the gang between 2010 and 2013.  The trial court granted Vejar's motion to sever his charges, and Vejar proceeded to trial alone.  After a jury trial, Vejar was convicted of active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a))[1] and conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379) with a gang enhancement (§ 186.22, subd. (b)(1)(A)).  The trial court sentenced Vejar to a total term of 25 years to life in prison.

On appeal, Vejar argues (1) the trial court erroneously admitted evidence of a gang member's murder, (2) defense counsel rendered ineffective assistance when he failed to object to the gang expert's testimony that Vejar was guilty of conspiracy to sell methamphetamine for the benefit of or in association with the Nuestra Familia gang,

---

[1] Unspecified statutory references are to the Penal Code.

(3) the cumulative impact of the trial court's errors deprived him of a fair trial, (4) the sentence for his active gang participation conviction must be stayed under section 654, (5) remand is required to permit the trial court to exercise its sentencing discretion under Senate Bill No. 1393, and (6) his prior prison term enhancements must be stricken under Senate Bill No. 136.

As we explain, we reverse the judgment and remand the matter for the limited purpose of permitting the trial court to exercise its discretion to strike Vejar's prior serious felony convictions. We further direct the trial court to strike the prior prison term enhancements and to stay the sentence for his active gang participation conviction.

## I. BACKGROUND

### 1. *The Indictment*

On May 31, 2013, the Santa Clara County grand jury indicted 48 alleged members and associates of the Nuestra Familia (NF) criminal street gang for various crimes that were committed between 2010 and 2013. Vejar was charged with active participation in a criminal street gang (§ 186.22, subd. (a); count 1) and conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379; count 2) with a gang enhancement (§ 186.22, subd. (b)(1)(A)). It was alleged that Vejar committed his offenses on or about and between June 10, 2010 and May 30, 2013. It was also alleged that Vejar had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12), two prior serious felony convictions (§ 667, subd. (a)), and two prior prison terms (§ 667.5, subds. (a) & (b)).

On September 21, 2015, the trial court granted Vejar's motion to sever his charges and he proceeded to trial alone.

### 2. *The Trial*

#### A. *Overview of the Prosecution's Theory and the Defense's Theory*

The prosecution's theory of the case was that Vejar sold methamphetamine and drugs for the benefit of and in association with the NF. The prosecution also theorized

2

that Martin Chacon, an NF member, was murdered by other NF members after Vejar made certain statements about him, which demonstrated Vejar's commitment to the gang and participation in the gang's conspiracy. The defense conceded that Vejar was a drug dealer, sold drugs to gang members, and had been in and out of prison multiple times. The defense, however, theorized that Vejar did not have a gang connection, was not involved in the NF, and his connection to Chacon's murder was based on speculation.

B. *The Nuestra Familia Gang*

a. *History and Structure of the Nuestra Familia*

Campbell Police Department Sergeant Dan Livingston testified as an expert in criminal street gangs operating in Santa Clara County. According to Sergeant Livingston, the NF started as a prison gang in the 1960s and was preceded by the Mexican Mafia. The Mexican Mafia was composed of Hispanic inmates and was formed for protection, dominance, and to run the "drug rackets" behind prison walls. The Mexican Mafia, however, began to victimize certain Hispanic inmates, specifically those inmates from Northern California, which resulted in the NF's creation.

The NF has a "paramilitary structure" with generals, captains, lieutenants, and soldiers. There are three categories of NF members, category 3, 2, and 1, with category 1 members being the newest members. The NF's leadership is housed in Pelican Bay State Prison. The NF abides by a constitution, which describes setting up street regiments to support the gang. There is both a state and a federal NF organization.

The NF is a "very violent" organization and has become one of the dominant street gangs in Northern California. The NF is associated with the number 14, the letter "N," and the color red.

NF members do not get "jumped into" the gang and obtaining NF membership takes "years and years" of committing crimes, getting sent to prison, and proving one's worth to the organization. Potential members may be brought into the Nuestra Raza (NR) organization, which is "still well below the [NF]." The NR is the "minor league

3

team" of the NF, and the NF stripped the NR of its name around 1997 and told its members to use the name "Norteños." Killing someone is not required to join the NF, but NR and NF members must kill without hesitation if ordered to do so. A member who leaves the NF is considered a traitor and is subject to being killed, slashed in the face, stabbed, or assaulted.

The NF controls prisons and county jails, and individuals that have committed transgressions against the NF will end up on a "bad news list" that gets circulated among inmates. Members that are on the bad news list can be ordered removed by the NF, which typically means they may be assaulted, stabbed, or slashed. Removals can take place on the street, and a member on the bad news list can be killed by a NF street regiment or a Norteño street gang. Although the NF's leadership is in prison, the NF's leaders are able to get messages out to the streets. Some messages are sent out using "kites," which are small pieces of paper with messages written on them. NF members also use three-way phone calls and jail visits to send messages. They also write mail using code and use cell phones.

According to Sergeant Livingston, the NF's primary activities include commission of murder, attempted murder, assault with deadly weapons, kidnapping, extortions, witness intimidation, drug sales, providing guns, theft, burglaries, and "any type of crime that can generate money for the [NF] organization."

b. *Predicate Offenses*

Martin Martinez's certified conviction records were admitted into evidence.[2] According to the records, Martin was convicted of conspiracy, possession of methamphetamine for sale with a gang enhancement, and possession of ammunition by a prohibited person with a gang enhancement for offenses that were committed on

---

[2] Martin Martinez and Angel Martinez are brothers and share the same surname. For clarity, we refer to them by their first names.

December 20, 2004. Sergeant Livingston was familiar with Martin, and Martin was the first NF member that Sergeant Livingston arrested in 2004. Martin was a squad leader in John Mendoza's street regiment and had sold methamphetamine. Martin was a category 2 NF member.

Sergeant Livingston was also familiar with Angel Martinez, Martin's brother. Sergeant Livingston arrested Angel for a robbery that was committed on April 22, 2005.

James Cramer's certified conviction records were admitted into evidence. Cramer was convicted of conspiracy to sell methamphetamine with a gang enhancement for offenses committed between September 1, 2006, and October 30, 2007. Cramer, an NF regiment commander, was a part of an earlier 2007 NF case that Sergeant Livingston investigated.

Lorenzo Guzman's certified conviction records were admitted into evidence. Guzman was convicted of five counts of conspiracy with gang enhancements, two of which were related to methamphetamine and two of which were related to assaults. Guzman's convictions arose from an investigation conducted by Sergeant Livingston's partner in 2009. Guzman, a NF member, ran a street regiment in Santa Clara County and had sold methamphetamine and phencyclidine (PCP).

Toody Zamudio's and Edmund Dejesus's certified conviction records were admitted into evidence. Zamudio was convicted of violating Health and Safety Code section 11351 and Dejesus was convicted of conspiracy and possession for sale of methamphetamine with a gang enhancement. Zamudio's conviction was based on a search of his house on October 23, 2012. Dejesus's conviction was also based on a search of his house on October 23, 2012. Zamudio was a Parkside Mob and NF gang associate. Dejesus was a Varrio 95 and NF associate.

C. *The NF Investigation in Santa Clara County*

In 2012, Sergeant Livingston began investigating the NF regiment that Vejar was associated with. His investigation began after he interviewed Luis Barrios, an NF

regiment commander who was trying to leave the gang. Based on information that Sergeant Livingston received from Barrios, Sergeant Livingston was able to obtain a search warrant on an inmate in jail that was connected to the NF. A search of the inmate's possessions turned up several kites that discussed NF business in Santa Clara County.[3] Eventually, Sergeant Livingston identified members of the NF regiment in Santa Clara County.

Albert Larez was the highest-ranking federal NF member in California. Larez's wife, Peggy, was an NF associate who assisted the gang with communications. Peter Cuen was a member of the Norteños "Most Deadly" street gang and was an NF associate. Martin Chacon used to sell drugs in San Jose for Larez and the federal branch of NF before he was killed on August 13, 2012. Ruben Cruz was an NF associate and was present at Chacon's murder. Angel was an NF member, and Jesus Cervantes was Angel's right-hand man and driver.

Based on information received from Barrios and the kites that Sergeant Livingston had found, Sergeant Livingston obtained a search warrant encompassing 12 houses to search for evidence of crimes including any drugs, guns, or gang-related communications. On October 23, 2012, the search warrant was executed, and multiple houses were searched. Officers searched the house of Jeffrey Orozco, who owned the Tatted Up II shop, which was used as a meeting ground for NF members and associates of the NF regiment. Barrios was a tattoo artist at Tatted Up II, and the shop gave him a place to covertly conduct gang business. Officers also searched Cervantes's house, where they found scales, ammunition, a loaded revolver, and handwritten documents with gang directives coming out of state prison and contact information for some NF members.

---

[3] Vejar's name and his gang moniker, "Fat Joe," were not in any of the kites that Sergeant Livingston had in evidence.

6

In November 2012, officers searched Leonard Rodriguez's house in Gilroy. Rodriguez was a longstanding NR member. Inside Rodriguez's house, officers found guns, including AK-series assault rifles that were not legally permitted to be sold in California. Some of the guns that were found were stolen. Officers also found 20 grams of methamphetamine.

D. ***The Search of Vejar's House and Evidence of Vejar's Gang Affiliation***

On March 29, 2013, Sergeant Livingston searched Vejar's house. On top of the dryer in Vejar's garage was a Styrofoam cup and a bag that had some methamphetamine residue.[4] There was also a shelf with a digital scale that had some methamphetamine residue. Sergeant Livingston found a "hide container" with some marijuana in it. He also found two parts of a cell phone with a removed SIM card that someone had attempted to snap in half. Officers did not find any NF paraphernalia in Vejar's house.

Officers also found a cell phone that Vejar's partner claimed was hers. Vejar's partner consented to officers looking at her phone and provided her passcode. Officers conducted a "Cellebrite download" of the contents of the phone, including her contact list, text messages, and call logs. After examining the call logs, Sergeant Livingston found several phone numbers that he associated with Vejar. Sergeant Livingston opined that Vejar was "flipping his phones" and using one phone number for a period of time before dropping that number and using a new number. Sergeant Livingston identified six numbers that he associated with Vejar and authored a search warrant to obtain text messages and call logs for those numbers. None of the numbers that were the subject of the search warrant were tied to Vejar's real name, a fact that Sergeant Livingston did not find surprising.

---

[4] The parties later stipulated that a crystalline substance found in Vejar's garage tested positive for methamphetamine.

According to the call logs of the phone numbers associated with Vejar, there were multiple calls between Vejar and Cuen between June 20, 2012 and August 18, 2012. Vejar's phone number was in NR member Joseph Salazar's phone.

Sergeant Livingston testified about certain text messages that were obtained from the phone numbers that he associated with Vejar. In one message, Vejar discussed the price of guns. In another message, Vejar discussed the price of a pound of marijuana. Vejar also sent messages that Sergeant Livingston interpreted to be discussing the price of methamphetamine. Some of Vejar's messages had gang references, such as using "ene" for "any" as a nod to the Norteños. Vejar received incoming text messages asking him about where to send money orders, which Sergeant Livingston linked to the NF practice of delegating others to buy money orders for them. Vejar also received incoming text messages telling him that there were Norteños being sent to prison. In the text messages that Sergeant Livingston reviewed, Vejar was never in the subordinate role. Many of Vejar's incoming text messages referred to him in a respectful tone, such as replying to Vejar with a " 'Yes, sir.' "

Sergeant Livingston also isolated text messages from Larez's phone. There were messages that referenced "Ruben" and "Joe," which Sergeant Livingston interpreted not as a reference to Vejar but a reference to another man, Josef Oakes. Larez and Vejar also exchanged messages. Larez gave his wife's bank account information to Vejar. Sergeant Livingston explained that this meant that if there were NF proceeds, dues, or profits from drug sales, Vejar could directly deposit the money into Larez's wife's account.

Sergeant Livingston opined that Vejar was initially an NR member and was later elevated to the NF. Sergeant Livingston opined that Vejar's text messages showed that he was in a position of authority within the gang. Moreover, he had meetings with known NF members.

8

Sergeant Livingston also testified that Vejar was supplying drugs to known NF members, and he was receiving money orders and was on the "C-payroll." According to Sergeant Livingston, the C-payroll is used by the street regiments to send money to incarcerated gang members. Sergeant Livingston had investigated six suspicious money orders, which he believed were payments from street regiments to NF members who were in custody. One of the money orders was sent to Vejar when he was incarcerated. The other money orders were sent to Martin Montoya (a high-ranking NF member), Robert Pacheco (an NR member who was indicted along with Vejar in the current case), Martin (Angel's brother and former NF regiment commander), Larry Lucero (an NF regiment commander), and Angel (an NF member). The money orders were sequential, meaning that they were bought at the same location, on the same date, and from the same vendor.

Based on all the evidence that he reviewed, Sergeant Livingston believed that Vejar committed the conspiracy to sell methamphetamine in association with a criminal street gang.

Vejar's tattoos were photographed when he was arrested. Vejar did not have any tattoos that were directly associated with the NF or NR. However, he did have a tattoo on his right forearm that was associated with a Norteño gang in Hayward. Sergeant Livingston testified that Vejar was not validated as an NF member by the California Department of Corrections and Rehabilitation because he was not an NF member the last time he was in custody.

E. *Evidence of Vejar's Drug Sales*

Jesus Cervantes testified under an immunity agreement.[5] Cervantes became a Northerner in 2010 after he was sent to jail for assault and battery. Cervantes started to

_____

[5] Cervantes was in protective custody in jail and was facing three pending attempted murder charges. At some point in early 2012, Cervantes was involved in a shooting at Creekside Bar and shot someone during the altercation. After the shooting, (continued)

spend time with Angel after he was released from jail, and Angel told Cervantes about Angel's association with the NF. Cervantes also became aware that Angel sold methamphetamine. Eventually, Cervantes also started to sell methamphetamine, and by mid-2012, Cervantes was involved with Angel's methamphetamine sales on a daily basis.

Sometime in July 2012, Angel introduced Cervantes to Vejar. Cervantes was present when Vejar told Angel that he had methamphetamine at a low price. Vejar said that he had connections to two cartel members and needed help selling drugs. Vejar also offered to sell Cervantes some methamphetamine. At some point, Vejar said that he wanted to establish a pipeline of drugs within the prison system because there was a lot of money to be made there. Angel told Cervantes that Vejar was "Norteno" and had "NR status." Cervantes once saw Angel go inside Vejar's house and come back with two ounces of methamphetamine. Cervantes did not see the actual drug transaction. Cervantes recalled going over to Vejar's house a little over five times to get "dope or methamphetamine."

Ruben Cruz testified with the understanding that his testimony at Vejar's trial would not be used against him in future criminal proceedings.[6] In 2010, Cruz and Josef Oakes met Larez at a bar in Red Bluff.[7] Larez asked Oakes and Cruz if they were Norteños, and they answered yes. Larez told Oakes and Cruz that he was an NF member and had been federally paroled to the area. As Cruz and Larez's relationship developed, Larez approached Cruz with an opportunity to make money. Larez said that he had money and connections, but he did not have knowledge of the Red Bluff area and wanted to tap into Oakes's and Cruz's local expertise. Larez, Oakes, and Cruz set up a

---

Cervantes testified that he was treated with more respect. Cervantes was subsequently involved in several other shootings against rival gang members in 2012.

[6] Cruz was presently facing a murder charge with a gang enhancement, which arose from Chacon's killing.

[7] Cruz testified that Larez's gang moniker was "Bird."

successful drug business in the area. Cruz knew that a portion of the money that they made was sent to inmates in prison that were related to the NF.

Larez told Cruz that Vejar was his drug connection in San Jose. One time, Larez had a meeting with Vejar, Oakes, Cruz, and another individual. In advance of the meeting, Larez told Cruz that they were looking for a drug connection, and Vejar had a connection with quality methamphetamine. At the meeting, the men discussed how the drugs would be trafficked to Red Bluff from San Jose. Vejar mostly talked about marijuana, but he also mentioned that he had a methamphetamine connection that was "almost cartel-based."

At some point after the meeting with Vejar, Cruz drove with Larez and Oakes to Vejar's house in San Jose. Vejar and Larez spoke in a separate room and then came back. The men proceeded to the garage where they picked up the methamphetamine from a toolbox near the laundry area. Cruz recalled that they received about an ounce of methamphetamine in a sandwich bag. Larez said that they were purchasing the methamphetamine for $485. Cruz thought that was "a killer deal for an ounce." The men then discussed when they would come back and how soon they would need more drugs, which depended on how quickly they sold the ounce they had just purchased.

Within three or four days, Cruz and Oakes went back to Vejar's house. The men purchased another ounce to an ounce and a half of methamphetamine.

After this second purchase, Cruz's interactions with Vejar slowed. Cruz had gotten into some trouble with law enforcement and had been caught with methamphetamine. Before Chacon was killed, Cruz estimated that he purchased methamphetamine from Vejar at least four times. Cruz knew that Vejar also supplied a connection for heroin, and Cruz and Oakes traveled to Stockton once to get heroin. One time, Oakes, Larez, and Cruz met Vejar in Vacaville.

11

F. *Chacon's Murder and Vejar's Involvement*

  a. ***Issues Between Chacon and the NF Street Regiment***

Luis Barrios testified under a grant of immunity.[8]  Barrios was a "carnal" in the NF gang and was a NF member.[9]  Barrios ran the NF street regiment in Santa Clara County after he was released on parole following a stint in prison.  Barrios intended that the gang's primary activity would be to sell methamphetamine, but the gang also committed bank robberies and assaults.

  Barrios initially thought that Manuel Montiel would be a good drug connection.  Montiel, however, had issues with Angel and Martin.  The NF began to take offense with the way that Montiel was dealing with certain things, and the gang decided to have somebody kick in Montiel's door and rob him.  The individuals who broke into the house left when they saw that there were children inside Montiel's house, but Montiel and a friend pursued the other members, a fight broke out, and gunshots were fired.

  Barrios had previous conversations with Cuen.  Cuen told Barrios that Angel and Chacon were trying to sell their drugs and collect money for the federal NF regiment.  Barrios told Cuen that the NF did not have different regiments in Santa Clara County, and there was only one regiment that answers to Pelican Bay.  Barrios also told Cuen that if Chacon did not stop saying that he was the federal NF regiment leader, he was " 'going to get smacked' " or killed.  Barrios later spoke to Angel and told him, " 'Let [*sic*] Kung Fu [(Chacon)] to knock his shit off or we're going to smack him.  He's going to get

---

  [8] Barrios testified that he was currently facing approximately 35 criminal charges arising from five bank robberies.  Barrios also testified that he had an extensive criminal history; he had once stabbed someone and had previously been arrested for attempted murder.  When he was a minor, he stole cars, guns, and robbed houses.  Between the ages of 15 and 39, Barrios had only been out of custody for a total of two and a half years.

  [9] Barrios testified that he was now on the bad news list.  He had initially intended to violate his parole to "turn [himself] in," but he ended up getting arrested for the bank robberies.  After Barrios's arrest for robbery, he went into protective custody.

smacked.' " At the time, Barrios did not know that Angel and Chacon had their own "personal issues."

Cervantes also knew Chacon. Cervantes met Chacon sometime in February 2012, shortly after a shooting at the Creekside Bar. Angel brought Cervantes over to Chacon's house. Cervantes recalled that the two men spoke about a robbery, and Chacon was upset because there were kids present during the robbery. Chacon told Angel that "somebody is going to talk to Angel, or somebody's going to be dealt with on that—on behalf of that situation." Later, Angel complained about how Chacon was functioning with the federal NF regiment and was not involved in the NF street regiment.

Sergeant Livingston also testified about some of the issues between the gang members. Montiel used to date Chacon's " 'baby mama.' " Montiel was a drug dealer and was not "playing well" with the NF street regiment, so Barrios and Angel decided to attempt to rob him. Chacon became upset because his children were at Montiel's house at the time the robbery was attempted.

b. *Chacon's Murder and the Aftermath of the Murder*

i. *Cruz's Testimony*

Chacon was murdered on August 13, 2012. On the day that Chacon was killed, Cruz testified that he traveled from Red Bluff to San Jose with Oakes and Larez. Cruz knew that they were going to be buying methamphetamine. Larez had also mentioned to Cruz that Chacon might be an informant, and he was investigating that allegation. During the drive from Red Bluff, Larez called Angel. The conversation sounded like a "progress report" to let Angel know that the men were getting close to San Jose. Cruz thought that they would be meeting Chacon, getting the methamphetamine, then leaving. When they arrived in San Jose, the men stopped at a fast food restaurant. Larez called Angel to tell him that they were in San Jose and to meet them at the restaurant.

Larez told Angel that they were going to meet Chacon, and he did not want Angel to leave until after the meeting. Angel was with a friend at the time, Cervantes. Larez

13

then called Chacon for him to come over. After he made the phone call, Larez told the men that Chacon was on his way and asked Cruz if he had his money. Cruz answered yes, and Larez replied, " 'Good, 'cause we're going to kill this dude.' " Cruz thought Larez was serious based on the way that he looked. There was no further discussion on how the murder was going to take place or who was going to pull the trigger.

The men drove over to an industrial area. Cervantes and Angel parked in their truck. In a separate car, Larez, Oakes, and Cruz parked on the opposite side and waited until Chacon arrived. When Chacon arrived, Larez got out of the car and had a conversation with Chacon. Larez walked back to Cruz and Oakes, opened the car door, and made a "gun shape" with his hand toward Oakes without saying a word. Oakes then got out of the car, lifted up his shirt, and pulled out a gun, walking toward Chacon. Larez walked toward Chacon at the same time. Oakes shot Chacon multiple times. Around the time that the shooting stopped, Cruz saw Larez go around to the back seat of Chacon's car and grab a bag. Cruz also saw Larez "put something" to the back of Chacon's head, and Chacon's head flew forward and blood spattered out of his mouth or cheek. Oakes and Larez went back to the car, and the men drove away.

The men stopped at a gas station near the Fairfield area. Cruz saw Larez making phone calls. Cruz thought that Larez called Angel and told him that they were on their way home and were going to dump the guns. The men left the guns in a dumpster at the gas station. Later, they examined what was inside the backpack taken from Chacon's car. The men found various electronics and some drug paraphernalia. Larez expressed disappointment that they had not found drugs. Larez told Cruz to contact Vejar if anything should happen to Larez.

### ii. *Cervantes's Testimony*

Cervantes testified that he, Angel, Larez, and Larez's "two little henchmen" participated in Chacon's murder. Before the murder, the men had a meeting about what was going to happen. Larez told Cervantes, " 'We about to kill Kung Fu [(Chacon)].' "

14

Cervantes responded, " 'Hey, homie, I got nothing to say on that.' " Chacon had been doing "a lot of fishy stuff." The men had heard that Chacon was in a relationship with a girl who worked with the FBI, and there were issues with Chacon saying that he was "the boss of San Jose."

Angel drove a truck, and Cervantes sat in the passenger side. Larez and Oakes, the actual shooter, were in a different car. The men parked and waited for Chacon to show up, and when he did, Larez went out to speak to Chacon. Later, Oakes went out of the car and shot Chacon.

After Chacon's murder, sometime in September 2012, Cervantes, Angel, and Larez went to Salinas. On the way back from Salinas, Larez said that he got "pulled" as a NF member, and that "Fat Joe from Hayward" (Vejar) also got pulled as a NF member "as a sleeper." Only certain individuals know the status of those who are "sleepers." At the time that Chacon was murdered, Vejar was a Norteño and had not yet been elevated to a NF member. Cervantes later dropped Larez off at Vejar's house. Cervantes recalled that there was a conversation about how Vejar was "stamped," and the NF does not stamp people for doing nothing.

Several weeks later, Larez came back to San Jose. Oakes, the person who actually shot Chacon, had just gotten "pulled" as a NR member. Cervantes asked Larez about the decision to kill Chacon, and Larez mentioned "that fat dude." Cervantes asked Larez who he was talking about, and Larez said, " '[t]hat dude, Fat Joe from Hayward.' " Cervantes recalled that Larez mentioned Vejar's name and about how Vejar had said something to Larez about Chacon. Cervantes testified that he did not believe that Larez was taking orders from Vejar; rather, something that Vejar had said helped Larez make "that final conclusion to move forward with that decision [Larez] already had in mind." Cervantes understood that Vejar was "functioning with" Larez at around the time Chacon was murdered. He believed that whatever Vejar said to Larez helped him make the final decision to kill Chacon.

15

c. ***Investigation into Chacon's Murder***

San Jose Police Department Sergeant Jaime Jimenez was on call as a homicide detective on August 13, 2012, when Chacon was killed. When Sergeant Jimenez arrived at the scene, Chacon's body was inside a Chevy Impala. Chacon had been shot multiple times, and officers found two ounces of methamphetamine underneath his pants.

Sergeant Jimenez started his investigation by identifying Chacon's phone numbers, and he obtained search warrants for phone numbers associated with Chacon and several phone numbers that he had been communicating with before he was killed. One of the numbers that Chacon had been communicating with was associated with the name "Carl Gambino," which was an alias used by Angel.

Sergeant Livingston testified about some of the cell phone logs detailing calls between Larez, Chacon, Angel, and Vejar. According to Sergeant Livingston, Larez's phone logs from between August 12 to August 14, 2012 indicated that he called Chacon several times. Larez also called Vejar. On August 12, 2012, at 8:51 p.m., Larez called Chacon. On August 13, 2012, at 9:05 a.m., Larez called Vejar, and the phone call lasted approximately six minutes.

On August 13, 2012, at 10:40 a.m., Larez called Chacon again. After Larez called Chacon, he called Angel. Within two minutes of that call, Larez called Vejar again and had a 43-second conversation. Afterwards, there was another call made by Vejar to Larez. Larez then received two phone calls from Chacon. Subsequently, phone calls were made between Angel and Larez. There was also a three-way call. At around 2:30 p.m., Larez made two phone calls to Vejar. At 11:10 p.m., Angel called Larez. The following day, on August 14, there were several phone calls between Vejar and Larez.

Additional phone logs showed that Vejar, Larez, and Cuen called each other in the weeks leading up to Chacon's murder.

16

3. *The Verdict and Sentencing*

On November 4, 2015, the jury found Vejar guilty of active participation in a criminal street gang (§ 186.22, subd. (a); count 1) and conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379; count 2) with a gang enhancement (§ 186.22, subd. (b)(1)(A)). That same day, Vejar waived his right to a jury trial on his prior convictions and admitted the prior convictions as alleged.

On December 9, 2016, the trial court sentenced Vejar to a total term of 25 years to life consecutive to 13 years. On count 2, conspiracy to sell methamphetamine (§ 182, subd. (a)(1); Health & Saf. Code, § 11379) with a gang enhancement (§ 186.22, subd. (b)(1)(A)), the trial court sentenced Vejar to a term of 25 years to life for the conspiracy to sell methamphetamine and a determinate term of three years for the gang enhancement. On count 1, active participation in a gang (§ 186.22, subd. a)), the trial court sentenced Vejar to a concurrent term of 25 years to life. The trial court imposed an additional 10 years for Vejar's prior serious felony convictions (§ 667, subd. (a)). The trial court stayed the two prior prison term enhancements (§ 667.5, subds. (a) & (b)).

## II. DISCUSSION

### 1. *Admission of Evidence of Chacon's Murder*

Vejar argues that the trial court erroneously admitted evidence of Chacon's murder and Vejar's alleged connection to it. Vejar argues that the evidence was irrelevant and constituted improper character evidence. Vejar argues that even assuming that the evidence was probative of the issues at trial, any probative value was substantially outweighed by its prejudicial effect.

#### A. *Background*

Sergeant Livingston was the first witness to testify about Chacon's murder. Sergeant Livingston, however, did not testify about Vejar's alleged connection to the murder. Sergeant Livingston testified about the attempted robbery at Manuel Montiel's house that took place when Chacon's children were present. Sergeant Livingston also

testified that there were communications between Larez, Angel, Cuen, and Chacon before Chacon was murdered, and Cruz and Angel were present when Chacon was murdered.

Sergeant Jimenez was the next witness to testify about Chacon's murder. Sergeant Jimenez testified about his investigation into the murder, including what time he arrived at the scene of the crime, where Chacon's body was found, and whether Chacon's gunshot wounds were visibly apparent. When Sergeant Jimenez started to testify about the bullet casings that he found at the scene of the crime, defense counsel objected under Evidence Code section 352. The trial court held an unreported sidebar with defense counsel and the prosecutor and subsequently overruled the objection. Sergeant Jimenez then continued to testify about his role in investigating Chacon's murder, including how he identified some of Chacon's phone numbers and obtained search warrants for those numbers and several phone numbers that Chacon had been communicating with before he was killed. According to Sergeant Jimenez, Chacon had been in communication with a phone number associated with an alias used by Angel.

Following Sergeant Jimenez's testimony, the trial court discussed defense counsel's earlier evidentiary objection on the record. Defense counsel stated: "In summary, my 352 motion is multi-facet[ed]. First of all, I'm not objecting to any showing that . . . Vejar called someone who is associated with a Norteno. That's not an issue with me. I understand that's extremely low." Defense counsel then continued by explaining: "I understand the relevance of that. I'm not objecting to that. What I am objecting to, and I was concerned and now I'm convinced, there's going to be an awful lot of evidence to prove that this individual that my client talked to coincidentally killed someone on one of the days that my client talked to him. First of all, what's the relevance of that phone call without more evidence or some prima facie showing that my client is somehow involved in the murder? And I feel it's extremely prejudicial and not probative as to his gang membership that gang members are killing people. We know they're killing people. And now he's got a newspaper article that talks about a string of

18

murders connected to the murder that he supposedly talked to the shooter on. And I just think that's going a bridge too far."

The prosecutor argued, "I think it's prejudicial because it is probative . . . Cervantes, is going to testify that it was articulated directly before the murder that the final straw and, really, the death sentence of Martin Chacon was a result of Fat Joe [(Vejar)] telling Albert Larez that Martin Chacon was a snitch. That's the first part. [¶] . . . [¶] And a variety of other reasons. I have an active gang participation charge in here. Methamphetamine sales is obviously the big thing I'm focusing on, but the involvement of Mr. Vejar with Mr. Larez in August of 2012, and with others, Peter Cuen especially, it supports him being involved at a very high level in this organization. The association theory of liability is the primary theory of liability here, and you can only have folks associating when they're both involved. So the status of Albert Larez is critically important for me, and there are a variety of other reasons, but those are the primary reasons." The prosecutor added, "[Vejar] is charged with active gang participation and he's charged in an NF-related conspiracy, and it's highly pertinent to both of those."

After considering the parties' arguments, the trial court concluded: "Well, clearly it's extremely probative evidence. This witness is going to testify, is going to be— attempted to be discredited by [the d]efense every which way but loose [*sic*], and this is corroborating evidence of that witness' testimony that the defendant was the shot caller in the organization. The whole defense is he has nothing to do with the Nuestra Familia except having to be friends with some of the people who appear to be members of the Nuestra Familia. [¶] So it's extremely probative. Its prejudicial effect does not outweigh the probative value, and it's admissible."

Subsequently, Cervantes and Cruz testified about their role in Chacon's murder. Cervantes specifically testified that he had a conversation with Larez after Chacon was killed, and Larez said something that suggested that Vejar made statements that led to

19

Larez's decision to kill Chacon. Cervantes further testified that Larez was not taking orders from Vejar when he killed Larez, but Vejar said something to Larez that helped Larez make "that final conclusion to move forward with that decision [to kill Chacon] that [Larez] had in mind." Cruz testified in detail about Chacon's killing, describing that Oakes shot Chacon multiple times, and Cruz later saw Larez put something to the back of Chacon's head and blood subsequently splattered out of his mouth and cheek. Sergeant Livingston testified about some of the phone logs that documented calls made between Vejar and Larez around the time that Chacon was murdered. Vejar did not object when Cervantes, Cruz, or Sergeant Livingston testified about Chacon's killing.

During his closing argument, the prosecutor argued that Chacon's murder was a "unique window . . . into the world of this very tight meth conspiracy." The prosecutor described that Chacon was "shot execution-style in the day," and prior to Chacon's murder, there was evidence that calls were made between Larez, Chacon, Vejar, and Angel. The prosecutor also argued that after Chacon was killed, there was evidence that Vejar continued to sell drugs to Angel.

Before retiring for deliberations, the jury was instructed with CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancement charged; [¶] OR [¶] The defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

B. *Forfeiture*

The Attorney General argues that Vejar has forfeited his arguments pertaining to the admission of evidence related to Chacon's murder because he failed to make timely and specific objections below. Vejar argues that his objection under Evidence Code section 352 during Sergeant Jimenez's testimony was sufficient to preserve his appellate claims because of the lengthy discussion that followed and that no further objection was required.

Evidence Code section 353 provides in pertinent part that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." Thus, a defendant's failure to make a timely and specific objection to evidence on the grounds asserted on appeal forfeits the claim. (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).)

" 'The reason for the requirement [of a timely and specific objection] is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial court to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' " (*Partida*, *supra*, 37 Cal.4th at p. 434.) "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " (*Ibid.*)

For example, when a defendant makes an objection to an in limine ruling admitting evidence, the objection is usually insufficient to preserve the issue for appeal if

the objection is not repeated when the evidence is offered at trial.  (*People v. Morris* (1991) 53 Cal.3d 152, 190 (*Morris*), disapproved of on another point in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)  A motion in limine to exclude evidence, however, will preserve an issue for appeal even if an objection is not made when the evidence is offered when "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context."  (*Morris*, *supra*, at p. 190.)

Preliminarily, we find that Vejar has *not* forfeited his appellate arguments under Evidence Code section 352 pertaining to the admissibility of Sergeant Jimenez's testimony and evidence of the phone calls made between Vejar and those involved in Chacon's murder.  Vejar made a timely objection to Sergeant Jimenez's testimony about his investigation into Chacon's murder and defense counsel specifically questioned the relevance of evidence of a "phone call" made between Vejar and those involved in Chacon's killing.  We perceive this objection to also be specific enough to encompass Sergeant Livingston's subsequent testimony describing phone calls made by Vejar to those involved in Chacon's murder.

Furthermore, during the trial court's discussion with counsel, the prosecutor specifically argued that the challenged evidence was probative because "Cervantes[] is going to testify that it was articulated directly before the murder that the final straw and, really, the death sentence of Martin Chacon was a result of [Vejar] telling Albert Larez that Martin Chacon was a snitch."  Thus, the admissibility under Evidence Code section 352 of Cervantes's subsequent testimony that Larez stated that his decision to kill Chacon was based on information provided to him by Vejar was considered by the trial court, and Vejar has not forfeited his claims pertaining to this testimony.

22

We reach a different conclusion with regards to the other evidence that was elicited about Chacon's murder. Vejar did not object until *after* Sergeant Jimenez had already testified about the crime scene, including how he found Chacon's body "seated inside the vehicle, slumped over, [with] multiple gunshot wounds," and Vejar did not move to strike this testimony. Furthermore, Vejar did not object on any grounds when Cervantes and Cruz later testified about the details of the murder, including how it was carried out.

Vejar's Evidence Code section 352 objection asked the trial court to evaluate whether, at the point during the trial when the objection was made, the "evidence to prove that this individual that [Vejar] talked to coincidentally killed someone on one of those days that [Vejar] talked to him" was substantially more prejudicial than probative. The prosecutor responded that the evidence was probative because "the cooperating witness, [Jesus] Cervantes, is going to testify that it was articulated directly before the murder that the final straw and, really, the death sentence of Martin Chacon was a result of Fat Joe [(Vejar)] telling Albert Larez that Martin Chacon was a snitch," and "the involvement of Mr. Vejar with Mr. Larez in August of 2012, and with others, Peter Cuen especially, . . . supports him being involved at a very high level in this organization."

At the time Vejar objected, it would have been impossible for the trial court to assess whether the testimony of Cervantes and Cruz *about the circumstances of the murder* would be unduly prejudicial or cumulative. This is especially the case given that Vejar specifically objected to the admission of evidence that "this individual that [Vejar] talked to coincidentally killed someone on one of the days that [Vejar] talked to him," and he did not raise objections to testimony pertaining to how the murder was carried out. Although the trial court concluded that evidence about Chacon's murder was probative, it did not blanketly state that *all* evidence related to the murder was admissible. There is also no reason to believe that the trial court would not have entertained a later objection to the challenged evidence given the subsequent testimony that was elicited by the

23

prosecutor. " 'The overruling of an objection to one item of evidence does not necessarily mean an objection to different evidence would have been futile,' even when the items at issue concern the same subject." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 421.)

Here, like a motion in limine that fails to preserve a claim for appellate review, Vejar's Evidence Code section 352 objection was not "directed to a particular, identifiable body of evidence" and was not "made at a time before or during trial when the trial judge [could] determine the evidentiary question in its appropriate context." (*Morris, supra*, 53 Cal.3d at p. 190.) "An objection to evidence must generally be preserved by specific objection *at the time the evidence is introduced*." (*People v. Demetrulias* (2006) 39 Cal.4th 1, 22, italics added.) Vejar's failure to timely and specifically object has therefore forfeited some of his arguments pertaining to the admissibility of evidence related to Chacon's murder. (*People v. Flinner* (2020) 10 Cal.5th 686, 738 [defendant who made several evidentiary objections to evidence of victim's pregnancy forfeited objections to other evidence of victim's pregnancy that were not raised below].)

Additionally, Vejar at no time objected on the grounds that evidence of Chacon's murder constituted improper character evidence or that its admission violated due process principles. In *Partida*, the California Supreme Court determined that a defendant who does not raise a due process objection below can make a "very narrow due process argument on appeal" (*Partida, supra*, 37 Cal.4th at p. 435) that a trial court's admission of evidence over an Evidence Code section 352 objection "had the additional legal consequence of violating due process." (*Partida, supra*, at p. 435.) However, to the extent defendant asserts a different theory for exclusion on appeal "than he asserted at trial, that assertion is not cognizable." (*Id*. at p. 438.) Thus, Vejar has forfeited his argument that admission of evidence of Chacon's murder was improper character evidence or that its admission violated his due process rights because it constituted

improper character evidence.  On the other hand, Vejar has preserved his claim that his due process rights were violated due to the trial court's admission of some of the evidence—the phone calls and Cervantes's testimony about his conversation with Larez—over his Evidence Code section 352 objection.

### C. *General Principles and Standard of Review*

In general, "all relevant evidence is admissible."  (Evid. Code, § 351.)  Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

Relevant evidence must be excluded "when its probative value is *substantially* outweighed by its prejudicial effect."  (*People v. Tran* (2011) 51 Cal.4th 1040, 1047 (*Tran*); Evid. Code, § 352.)  " 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' "  (*Tran*, *supra*, at p. 1047.)

We "appl[y] the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence."  (*People v. Waidla* (2000) 22 Cal.4th 690, 723.)[10] "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, overruled on a different ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  Erroneous admission of evidence that is

_____

[10] Citing *People v. Seijas* (2005) 36 Cal.4th 291, 304, Vejar argues that the independent standard of review, not the abuse of discretion standard, should apply because the facts are such that this court can assess the situation as well as the trial court and the evidentiary ruling affected his constitutional right to a fair trial and to due process of law.  In *Seijas*, the California Supreme Court determined that the independent standard of review applied to a trial court's ruling on a witness's assertion of the privilege against self-incrimination.  (*Ibid*.)  *Seijas* did not hold that the independent standard of review applies to claims of evidentiary error.

unduly prejudicial under Evidence Code section 352 requires reversal of the judgment only if it is reasonably probable that the defendant would have received a more favorable verdict absent the error. (*Partida*, *supra*, 37 Cal.4th at p. 439.)

D. *Analysis*

In this case, Vejar was charged with active participation in a gang and conspiracy to sell methamphetamine with a gang enhancement. "Any person who actively participates in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" is guilty of active participation in a gang. (§ 186.22, subd. (a).) A gang enhancement requires proof that a person commit a felony "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

Evidence that Vejar knew about Chacon's murder and may have said something that influenced Larez's decision to kill Chacon suggested that Vejar was not simply a drug dealer who sold drugs to gang members, but rather that he was more deeply involved with the gang, knew that the gang engaged in a pattern of criminal gang activity, and promoted its gang activity. Thus, evidence of Chacon's murder and Vejar's alleged involvement was relevant to the disputed issues at trial—whether Vejar actively participated in the gang and whether he committed the conspiracy to sell methamphetamine in association with the gang.[11] (Evid. Code, § 210; § 186.22, subds. (a) & (b).)

---

[11] In fact, during a pretrial hearing, defense counsel made the following comment about Chacon's murder that acknowledged the relevancy of the evidence: "That's an uncharged offense, and I'm assuming they're going to use that to bolster their 186, which seems like it would be relevant to the 186."

26

The issue is whether the trial court exceeded the bounds of reason when it concluded that evidence of the murder was not substantially more prejudicial than probative under Evidence Code section 352.

The prosecution argued that the evidence would show that Vejar had a connection to the NF. Cervantes, however, testified that Vejar did not order the killing, and he testified that he believed that whatever Vejar said to Larez merely helped Larez make "that final conclusion to move forward with that decision [to kill Chacon] he had in mind." There is no evidence of what Vejar said to Larez and whether the information that Vejar relayed to Larez was related to the gang.[12]

The potential for prejudice from admission of this type of evidence was high. Vejar was charged with a conspiracy to sell methamphetamine and active participation in the gang. Although there was other, unchallenged evidence that the NF was a violent organization, evidence that Vejar was associated with a murder was significantly more inflammatory than the evidence of the charged offenses. (*Tran*, *supra*, 51 Cal.4th at p. 1047 [potential for prejudice is decreased when testimony describing uncharged acts is "no stronger or more inflammatory than the testimony concerning the charged offense"].) Although it was clear that Vejar's participation in the murder was minimal—Cervantes testified that Vejar said something to Larez that helped Larez decide to kill Chacon— evidence that Vejar was linked to a murder is the type of " 'evidence which uniquely

---

[12] During his opening statement, the prosecutor argued, "We know from people who were there at the murder that co-conspirators of this meth conspiracy said that the final straw for Martin Chacon getting murdered was Joseph Vejar saying he was a snitch. You're going to hear that. And you're going to see evidence of it." The prosecutor, however, never elicited evidence that Vejar told Larez that Chacon was a snitch. At trial, Cervantes testified that he asked Larez about the decision to kill Chacon, and Larez mentioned "that fat dude." Cervantes asked Larez who he was talking about, and Larez said, " '[t]hat dude, Fat Joe from Hayward.' " Cervantes testified that he believed that something that Vejar said helped Larez make "that final conclusion to move forward with that decision [Larez] had in mind."

27

tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

A trial court's exercise of discretion under Evidence Code section 352 "will not be reversed merely because reasonable people might disagree." (*People v. Preyer* (1985) 164 Cal.App.3d 568, 573.) In this case, we conclude that even if we assume that the challenged evidence that was objected to below should have been excluded, reversal is not required because Vejar has not demonstrated that he was prejudiced.

### E. *Harmless Error*

The erroneous admission of evidence is reversible error only if it is reasonably probable that a defendant would have received a more favorable verdict in the absence of error. (*Partida, supra*, 37 Cal.4th at p. 439.)[13]

There was strong evidence that Vejar sold drugs and committed the conspiracy to sell drugs for the NF's benefit. First, there was overwhelming evidence that Vejar sold drugs to NF members. Sergeant Livingston testified that Larez was a NF member, Cruz was a NF associate, and Angel was a NF member. Cervantes testified that Angel introduced him to Vejar, and Cervantes was present when Vejar told Angel that he had methamphetamine at a low price. Vejar also offered to sell Cervantes some

---

[13] In his reply brief, Vejar argues that we should reach the merits of all of his evidentiary claims—including those that he forfeited, such as his challenges to the testimony provided by Cruz and Cervantes about the circumstances of the murder—to forestall a petition for writ of habeas corpus based on a claim of ineffective assistance of counsel. He further argues that his trial counsel rendered ineffective assistance by failing to object when additional testimony about the murder was elicited. Vejar's claim of ineffective assistance of counsel, however, was belatedly raised in his reply brief in response to the Attorney General's forfeiture argument and is therefore waived. (*People v. Harris* (2008) 43 Cal.4th 1269, 1290 [claim of ineffective assistance of counsel raised for the first time in a reply brief in response to the Attorney General's waiver argument was "belated"]; *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim of ineffective assistance of counsel was omitted from appellant's opening brief and was thus waived].) We therefore do not consider whether admission of evidence that Vejar did not object to below amounted to reversible error.

methamphetamine. Cruz was present at meetings where Vejar discussed selling drugs, and Cruz testified that he and Larez purchased drugs from Vejar. When officers searched Vejar's house, they discovered methamphetamine residue, and there was evidence that multiple text messages sent from phone numbers that were associated with Vejar discussed subjects like the price of drugs.

There was also strong evidence that Vejar was associated with the NF gang and conspired to sell methamphetamine for the benefit of or in association with the gang. Cervantes testified that Angel told him that Vejar was a "Norteño" and had "NR status." Cervantes also testified that Larez later told him that Vejar was pulled "as a sleeper" NF member. Sergeant Livingston testified that text messages from numbers associated with Vejar used gang references, such as using "ene" for "any" as a nod to the Norteño gang. Vejar received incoming text messages asking him where to send money orders, which Sergeant Livingston linked to the NF practice of delegating the purchase of money orders. There were multiple calls and text messages between Vejar and known NR and NF members. Vejar also received incoming text messages telling him that there were Norteños being sent to prison. Sergeant Livingston further testified that text messages sent to Vejar were phrased in a respectful tone, such as referring to Vejar as "sir," and Vejar was never in a subordinate position in the messages that were reviewed, suggesting that Vejar had a position of authority within the gang. In fact, Larez, a known NF member, gave Vejar his wife's bank account information.

There was also evidence that Vejar himself received money orders while incarcerated and was on the "C-payroll," a system where NF street regiments send money to incarcerated NF members. Sergeant Livingston testified that he investigated a sequential series of six money orders that were sent to Vejar and to five known NF members, evidence that strongly suggested that Vejar himself was a NF member. In fact, based on the evidence that he reviewed, Sergeant Livingston opined that Vejar was a NR member and was later elevated to the NF.

29

Additionally, during closing argument, the prosecutor did not argue that Vejar's alleged involvement in Chacon's murder should be used for an improper purpose or was evidence that he had a predisposition to commit crimes. The prosecutor discussed Chacon's killing and argued that the murder was a "unique window . . . into the world of this very tight meth conspiracy," referencing evidence that showed there was communication between Vejar and those involved in his murder and evidence that Vejar continued to sell drugs to Angel after Chacon was killed. In sum, the prosecutor used the evidence of Chacon's killing to argue that Vejar was a NF member and was aware of the gang's criminal activities, not that he was a murderer or should be punished for his involvement in the killing. Furthermore, the jury was specifically advised that it was not to consider evidence of gang activity, which includes Chacon's murder, to conclude that Vejar "is a person of bad character or that he has a disposition to commit crime." We must " ' "presume that jurors comprehend and accept the court's directions." ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 816.)

We acknowledge that evidence of the murder was more inflammatory than the charged offenses, which involved Vejar's drug sales. Chacon's murder, however, was not the only evidence that the NF engaged in violent activity. Cervantes testified, without objection, that he was involved in a shooting in 2012. Cervantes also testified that he was facing three pending attempted murder charges. Barrios testified that he had an extensive criminal history; he had once stabbed someone and had previously been arrested for attempted murder. Thus, even in the absence of evidence of Chacon's killing, the jury was already presented with ample evidence that NF gang members and associates, including those known to be associated with Vejar, engaged in multiple acts of violence.

Furthermore, there was no dispute that Vejar's role in the killing was limited. There was no evidence and the prosecutor never argued that Vejar was directly involved in the killing. Cervantes testified that Vejar did not order Larez to kill Chacon; Larez decided to do so himself, although Vejar said something to Larez that influenced his

30

decision. Furthermore, Cruz and Cervantes both testified that Chacon's murder was carried out by Cruz, Oakes, and Larez. The limited role played by Vejar reduced the possibility that the jury might be inclined to punish Vejar for his involvement. (See *Tran*, *supra*, 51 Cal.4th at p. 1047 [prejudicial effect of evidence of uncharged misconduct increased if acts did not result in criminal conviction because "jury might be inclined to punish the defendant for the uncharged acts"]; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1139 [danger of prejudice resulting from evidence of 14 prior gang-related shootings was reduced because the defendant was not involved in the other shootings].)

After a careful review of the record, and considering the compelling evidence of Vejar's guilt, we do not believe that Vejar meets his burden to demonstrate prejudice. Even if the challenged evidence had been excluded, it is not reasonably probable that he would have received a more favorable verdict. (*Partida*, *supra*, 37 Cal.4th at p. 439.)

Finally, we reject Vejar's claim that admission of the challenged evidence violated his federal due process rights and thus must be reviewed under the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24. In *People v. Albarran* (2007) 149 Cal.App.4th 214, the Second Appellate District concluded that the defendant's federal due process rights were violated and his trial was rendered fundamentally unfair by the admission of inflammatory gang evidence that was not relevant to the charged offenses and served no legitimate purpose. (*Id*. at pp. 232, 227-228.) Unlike *Albarran*, the gang evidence related to Chacon's murder *was* relevant to the charged offenses. Chacon's murder and Vejar's alleged role in it was relevant to whether Vejar was aware of the NF's criminal activities and was an active participant in the gang's criminal activities. Therefore, we find no violation of Vejar's federal due process rights.

2. ***Admission of Sergeant Livingston's Expert Opinion***

Vejar argues that defense counsel rendered ineffective assistance when he failed to object to Sergeant Livingston's testimony that he believed that Vejar committed the

31

conspiracy to sell methamphetamine for the NF's benefit. The Attorney General argues that there could have been a reasonable, tactical reason for counsel's failure to object, and Vejar has not demonstrated that he was prejudiced by his counsel's omission.

A. *Background*

On direct examination, Sergeant Livingston testified that he believed Vejar was a member of the NF gang during the period of the charged conspiracy. The prosecutor subsequently asked, "And, Sergeant, in your expert opinion, did Joseph Vejar commit the crime of conspiracy to sell methamphetamine for the benefit of, at the direction of, or in association with a criminal street gang?" Sergeant Livingston responded, "I believe it was in association with a criminal street gang. Obviously, he's selling drugs to known NF members and other members of the regiment, and it also is in benefit of the organization, as he's generating money for their organization and providing them a source of supply of methamphetamine."

The prosecutor then asked Sergeant Livingston, "[H]ow would the crime of conspiracy to sell methamphetamine benefit Mr. Vejar?" Sergeant Livingston responded, "Well, it benefits him because he's basically increasing his gang status. Aside from other things he may or may not have been doing for the organization, he is a large source of supply for methamphetamine; so it benefits him to be associated with the Nuestra Familia because it gives him more of a power base to do collections, and it also gives him more of a power base to sell methamphetamine too. [¶] He's networked out to Albert Larez's crew in Red Bluff, supplying them with methamphetamine, which is straight from the gang association with Mr. Larez. And also with Angel Martinez, he's able to move his drugs in San Jose through Angel Martinez and his regiment members."

Finally, the prosecutor asked, "And so aside from the personal benefits conferred on Mr. Vejar, how would Mr. Vejar's participation in this conspiracy benefit the larger Nuestra Familia organization?" Sergeant Livingston responded, "Well, he's providing

32

them a source of supply of methamphetamine, and among other drugs, which in turn, you know, he's generating money for the organization."

Thereafter, the prosecutor asked Sergeant Livingston the following hypothetical question: "So assume the following hypothetical: Assume that gang member A sold methamphetamine to gang members B, C, and D, and gang associates E and F. Assume that call records detail hundreds of calls between and among those gang members. [¶] Assume further that gang member A, once incarcerated, received payment from a payor or $200, and in the same transaction, five other members of high status in the organization were also paid by that same payor. [¶] In your opinion, would gang member A be acting with the intent to promote or further or assist credible contact by gang members?" Sergeant Livingston replied, "I believe they would. [¶] . . . [¶] He's providing drugs to other members of the gang who are, in turn, selling the drugs to generate money for the gang, and he is receiving money back from a gang associate while he's incarcerated, which is one of the benefits."

B. *General Legal Principles and Standard of Review*

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish that counsel's performance was deficient and that there was prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that counsel's representation was objectively unreasonable "under prevailing professional norms." (*Id.* at p. 688.) With respect to prejudice, a defendant must show "there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail

on an *appellate* claim of ineffective assistance.  On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."  (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

C. *Analysis*

Vejar cannot prevail on his claim of ineffective assistance of counsel because he has not demonstrated that his counsel's performance was objectively unreasonable or that he was prejudiced by his counsel's omissions.

Although Sergeant Livingston's opinion testimony was improper (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 (*Vang*) [it is generally improper for an expert to "testify directly whether [the defendant] committed the [crime] for gang purposes"]), defense counsel may have chosen to forego an objection because he did not want to draw the jury's attention to the challenged testimony (*People v. Campbell* (2020) 51 Cal.App.5th 463, 506 [competent counsel may forego valid objection for tactical reason]).

Defense counsel may have believed that an objection would have been fruitless because the prosecutor could have easily reframed his questions as hypotheticals. " 'Generally, an expert may render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' "  (*Vang, supra*, 52 Cal.4th at p. 1045.)  In fact, the prosecutor later *did* frame one of his questions as a hypothetical that was "rooted in the evidence."  (*Id.* at p. 1046.)

Accordingly, Vejar has not demonstrated that there "could be no satisfactory explanation" for defense counsel's failure to object below.  (*Mai, supra*, 57 Cal.4th at p. 1009.)

Likewise, Vejar does not demonstrate that he was prejudiced by his counsel's failure to object to Sergeant Livingston's testimony.  As we have stated, the prosecutor later asked if "gang member A [would] be acting with the intent to promote or further or

34

assist credible contact by gang members" by selling drugs, and Sergeant Livingston answered in the affirmative. Thus, the jury heard Sergeant Livingston's admissible opinion that selling methamphetamine under circumstances that match the facts alleged in this case would be for the gang's benefit. (See *People v. Ewing* (2016) 244 Cal.App.4th 359, 382-383 [error in admitting expert opinion that defendant's crime was gang related was harmless because prosecutor asked expert proper hypothetical that essentially elicited the same opinion].)

Vejar argues that the prosecutor's hypothetical did not track all of his earlier questions, and the prosecutor did not ask Sergeant Livingston to opine "whether a hypothetical defendant was conspiring to sell methamphetamine in association with or for the benefit of a criminal street gang, how the actions of a hypothetical actor in appellant's position would personally benefit [the hypothetical actor], and how the gang would benefit from the hypothetical actor." However, as we described in the preceding section of our opinion, independent evidence established that Vejar was associated with the NF and that the conspiracy to sell drugs was committed for the gang's benefit. Vejar received multiple text messages with gang references, he was referred to with respect in the messages, and he received money orders in prison that were consistent with money orders sent by street regiments to NF members. According to Cruz and Cervantes, Vejar supplied NF members with drugs.

Thus, we do not find that it is reasonably probable that Vejar would have received a more favorable verdict had defense counsel made timely objections. (*Strickland*, *supra*, 466 U.S. at p. 694.) Vejar's claim of ineffective assistance of counsel fails.

### 3. *Cumulative Prejudice*

Vejar argues that the cumulative prejudice of the erroneous admission of evidence of Chacon's murder and defense counsel's failure to object to Sergeant Livingston's improper testimony requires reversal of his convictions. We have concluded that Vejar's ineffective assistance of counsel claim has no merit because he has not demonstrated that

35

his counsel's failure to object to Sergeant Livingston's testimony was objectively unreasonable and he has not demonstrated that he was prejudiced. Thus, the only instance where we have found error is where we assumed that the trial court may have erred when it admitted some of the evidence pertaining to Chacon's murder. However, we concluded that any error was harmless. Since there are no other errors to cumulate, we reject Vejar's claim of cumulative prejudice. (*People v. Reed* (2018) 4 Cal.5th 989, 1018.)

4. ***The Sentence for Active Participation in a Gang (§ 186.22, subd. (a))***

The trial court sentenced Vejar to 25 years to life for active participation in a gang (§ 186.22, subd. (a); count 1) and 25 years to life and a determine term of three years for conspiracy to sell methamphetamine with a gang enhancement (§ 182, subd. (a)(1); Health & Saf. Code, § 11379; § 186.22, subd. (b)(1)(A); count 2). Vejar argues that his sentence for active participation in a gang (§ 186.22, subd. (a)) should be stayed under section 654 because it arose from the same course of conduct underlying his conviction for conspiracy to sell methamphetamine. The Attorney General concedes that the sentence for active participation in a gang should be stayed, and we agree.

In *People v. Mesa* (2012) 54 Cal.4th 191, the California Supreme Court held that section 654 prohibits punishing a defendant for a substantive gang offense if that offense is the felonious criminal conduct underlying a gang participation conviction under section 186.22, subdivision (a). (*Mesa*, *supra*, at p. 201.) The Attorney General agrees that Vejar's methamphetamine sales were the basis of the allegation that Vejar promoted, furthered, or assisted in felonious criminal conduct by members of his gang. When section 654 applies to two counts, the court must punish the defendant "under the provision that provides for the longest potential term of imprisonment." (§ 654, subd. (a).) In this case, the conspiracy to sell methamphetamine with the gang enhancement carries the longest potential term of imprisonment. Thus, section 654 requires that the term for active participation in a gang (count 1) be stayed.

5. *Sentencing Discretion Under Senate Bill No. 1393*

At sentencing, the trial court imposed a 10-year sentence for Vejar's two prior serious felony convictions (§ 667, subd. (a)). Vejar argues that remand is required to permit the trial court to exercise its newfound sentencing discretion under Senate Bill No. 1393 to strike his prior serious felony convictions. The Attorney General agrees that the matter must be remanded to permit the trial court to exercise its sentencing discretion.

Effective after defendant was sentenced, Senate Bill No. 1393 amended section 667, subdivision (a), and section 1385, subdivision (b), to allow a trial court to exercise its discretion to strike a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.) Under the previous version of section 667, the court was required to impose a five-year consecutive term for "[a]ny person convicted of a serious felony who previously has been convicted of a serious felony . . . ." (Former § 667, subd. (a).) The court had no discretion to "strike any prior conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (Former § 1385, subd. (b).) Senate Bill No. 1393 applies retroactively to nonfinal judgments. (*People v. Stamps* (2020) 9 Cal.5th 685, 699.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) When the record shows that the trial court proceeded with sentencing on the assumption that it lacked discretion, remand for resentencing is necessary "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid.*) Thus, we must review the record to determine whether remand is required or if it "would be an idle act." (*People v. Flores* (2020) 9 Cal.5th 371, 432.)

*People v. McVey* (2018) 24 Cal.App.5th 405 is illustrative of when remand for resentencing would constitute an idle act. There, the trial court chose the maximum term for the firearm enhancement, described the defendant's attitude as " 'pretty haunting,' "

and commented that " 'the high term of 10 years on the enhancement is the only appropriate sentence on the enhancement.' " (*Id*. at p. 419.)  The Court of Appeal concluded that remand for resentencing under Senate Bill No. 620, which gave trial courts new discretion to strike the firearm enhancement, "would serve no purpose but to squander scarce judicial resources." (*McVey*, *supra*, at p. 419; see also *People v. Jones* (2019) 32 Cal.App.5th 267, 274 [concluding that remand was unnecessary based on the trial court's comment that it had " 'great satisfaction in imposing the very lengthy sentence here today' "].)

In this case, the trial court did not "clearly indicate[] when it originally sentenced [Vejar] that it would not in any event have stricken [an] enhancement." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)  Thus, we agree with the parties that the matter must be remanded for sentencing.

### 6. *Prior Prison Term Enhancements*

The trial court imposed and stayed a four-year prison term for his prior prison terms (§ 667.5, subds. (a) & (b)).[14]  Vejar argues that his prior prison term enhancements should be stricken under Senate Bill No. 136.  The Attorney General agrees, and we concur.

Senate Bill No. 136, effective January 1, 2020, amended the prior prison term sentence enhancement under section 667.5, subdivision (b) by limiting its application to prison terms that, unlike Vejar's, were served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1.) We agree with the parties that the amendment applies retroactively to Vejar.  (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.)  We therefore order the prior prison term enhancements under section 667.5, subdivision (b) stricken.

---

[14] The trial court imposed a three-year term for the prior prison term enhancement under subdivision 667.5, subdivision (a) and a one-year term for the prior prison term under section 667.5, subdivision (b).

## III. DISPOSITION

The judgment is reversed and the case is remanded for the limited purpose of permitting the trial court to determine whether to exercise its discretion pursuant to Penal Code section 1385 to strike defendant's prior serious felony convictions (Pen. Code, § 667.5, subd. (a)).  On remand, the trial court is also directed to strike the allegations and associated sentencing enhancements for defendant's two prior prison terms (Pen. Code, § 667.5, subds. (a) & (b)) and to stay the sentence imposed for active participation in a gang (Pen. Code, § 186.22, subd. (a); count 1) under Penal Code section 654.

                                               _____

                                               BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____
ELIA, ACTING P.J.

_____
GROVER, J.

*People v. Vejar*
**H044486**